## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Marquise Jackson<br>507 Jefferson Ave.<br>Cleveland, Ohio 44113<br><br>                    Plaintiff,<br>          vs.<br><br>Sergeant Joseph Kelley<br>Sergeant Adam Broeckel<br>Corporal Eric Jecubic<br>Officer Ernest Phillips<br>Officer Joseph Johnston<br>Officer Ulysses Roscoe<br>Officer May Dwain<br>*In their personal and official capacities*<br>Cuyahoga County Jail<br>1215 W. 3rd St<br>Cleveland, Ohio 44113<br><br>                    Defendants. | Case No. _____<br><br> Judge _____<br><br>**Complaint with Jury Demand** |

### I. Introduction

1.      After officials of the Cuyahoga County jail had for three days deprived Plaintiff Marquise Jackson of his right to basic hygiene and sanitation, Jackson held a paper envelope against a corner of his cell window in an effort to catch the attention of jail officers to inform them of the ongoing violation of his rights.

2.      Upon receiving such notice, the officers unfortunately took this as an opportunity to impose egregiously unwarranted physical violence on Jackson, who was securely confined in his cell and presented no threat to the officers or anyone else.

3.      The attack on Jackson started when Defendants Joseph Kelley and Adam Broeckel, sergeants for the jail, gratuitously deployed eight rounds of pepper bombs into Jackson's cell despite the complete lack of need to do so.

4.      As Jackson's cell filled with the pepper bombs' toxic chemical discharge, Kelley then summoned a four-man tactical team—comprised of Defendants May Dwain, Ulysses Roscoe, Ernest Phillips, and Joseph Johnson—to forcibly extract Jackson from his cell despite that Jackson was threatening no violence and had been begging for days to leave his cell. The team then lined up outside of Jackson's cell and began slapping each other on the back in apparent excitement over their opportunity to use the force they were about to deploy against Jackson.[1]

5.      At Kelley's command, the team then charged into Jackson's cell, tackled him to the ground, and pinned him against the floor using a tactical shield before Phillips escalated the unlawful attack by gratuitously deploying pepper foam directly to Jackson's face.

6.      While the tactical team charged after Jackson without any legitimate reason to do so, sergeants Kelley and Broeckel, as well as Defendant Corporal Eric Jecubic, stood outside of the cell and watched, positioning themselves deliberately so that their body cameras would not capture footage of the events that unfolded once the tactical officers followed Kelley's directive to breach Jackson's cell door.

7.      After tackling and beating the defenseless Jackson to the floor and spraying pepper foam into his face, Defendants deliberately delayed in rinsing Jackson's eyes, decontaminating him from the Defendants' unlawful use of pepper spray and pepper foam, and granting him access to medical care, while they congratulated and applauded one another for the "good job" they did in needlessly attacking him.

8.      There was no legitimate need to attack Jackson as the officers did, nor was there any other situation that required force to maintain or restore order at the jail. Thus, Defendants are liable to Jackson for violating his Eighth Amendment right to be from the unnecessary and excessive use of

---

[1] According to the County in responding to public records requests, the only video depicting the officers storming Jackson's cell is available at the following link:

https://thepattakoslawfirmlcc.box.com/s/149wsxeb4dlkpv4pxvod4ycvb6ryj1e0

force and for causing Jackson to suffer severe injury as a result of having done so. And Defendants

are further liable to Jackson under Ohio law for assault and battery.

## II. Parties

9.      Jackson is a U.S. citizen and a resident of the City of Cleveland in Cuyahoga County, Ohio.

At all times relevant, Jackson was held in the Cuyahoga County Corrections Center ("the county jail"

or "the jail").

10.      Defendant Cuyahoga County is and at all relevant times was a political subdivision of the

State of Ohio, responsible for the county jail.

11.      Defendants, sergeants Joseph Kelley and Adam Broeckel, corporal Eric Jecubic, and officers

Ernest Phillips, Joseph Johnston, Ulysses Roscoe, and May Dwain, are correctional officers

employed by the county jail who, at all times relevant, were in uniform and acting under the color of

state law. This lawsuit is brought against each of them individually in both their official and personal

capacities.

12.      Defendant Cuyahoga County is vicariously liable for the conduct of Kelley, Broeckel,

Jecubic, Phillips, Johnston, Roscoe, and Dwain.

## III. Jurisdiction and Venue

13.      This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for

the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367

for the claims raised under Ohio law.

14.      This Court has jurisdiction over Defendants because they are residents of Ohio and work at

the county jail, whose conduct is at issue in this litigation.

15.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the

claims in this litigation are based and the damages resulting therefrom occurred in Cuyahoga County,

Ohio.

## IV. Facts

16.      On numerous occasions while Jackson was under the custody and care of the county jail, he

made jail staff and officials aware that he suffered from mental-health issues, including severe

depression and anxiety, and that due to these issues, he could not withstand extended or repeated

periods of time in an isolated cell, including disciplinary isolation.

17.      On or about February 5, 2020, jail officials moved Jackson into disciplinary isolation for a

period of seven days.

18.      While in disciplinary isolation, jail officials inexplicably prohibited Jackson from accessing or

receiving adequate sanitation or hygiene, including by preventing him from showering for multiple

days at a time and prohibiting him from removing waste from his cell.

19.      Jackson, who desperately needed a shower and whose mental health was deteriorating as a

result of another round of prolonged solitary confinement, began calling out to jail officials

requesting that he be permitted access to basic hygiene and sanitation as was his right as an inmate.

20.      Because jail officials were ignoring his requests for help, Jackson covered the bottom left

corner of his jail cell window with a single envelope, believing that jail officials would observe the

partially blocked window and engage in conversation with him, at which point he could receive the

adequate hygiene the jail had denied him for three days.

21.      On January 8, 2020, sergeants Kelley and Broeckel and corporal Jecubic approached

Jackson, who was securely confined in his cell. Once Jackson saw that jail officials had arrived

outside of his cell, Jackson began to repeat his demands that he be permitted a shower and accused

jail officials of having violated his rights as an inmate by denying him the right to basic hygiene.

22.      When Kelley, Broeckel, and Jecubic arrived outside of the cell, Jackson was holding a food

tray but was not acting in any manner that could have caused an officer to fear that Jackson

presented a threat to officers, jail staff, or other inmates. Nor was Jackson wielding the tray as a

weapon in an attempt to break out of his cell.

23.     Because the envelope covered only the bottom left corner of Jackson's window, officers could still easily view the entirety of Jackson's jail cell. Jackson's conduct in holding an envelope over part of his window did not present any situation or disturbance that required officers to deploy any amount of force against him to maintain or restore order or discipline at the jail.

24.     While Jackson attempted to voice his concerns that the jail had violated his right to receive basic hygiene, Broeckel and Jecubic told Jackson to go to the back of the cell and face the back wall.

25.     In response to Jackson's efforts to engage in conversation with the officers to access basic hygiene, Kelley and Broeckel each unnecessarily deployed four rounds of pepper bombs into Jackson's cell on the purported basis that Jackson had not immediately removed an envelope or moved to the back of his cell.

26.     After the officers deployed the toxic pepper bombs into Jackson's cell, Kelley began instructing Jackson to remain in place and put his hands through the food chute at the front of the cell, which contradicted the earlier command to go to the back of the cell and face the wall.

27.     Despite that Jackson could not possibly have complied with both contradictory orders, Kelley, Broeckel, and Jecubic deemed Jackson as "noncompliant" and summoned a four-man tactical team, armed in tactical gear and carrying shields, to extract Jackson from the cell.

28.     Moments later, tactical officers Dwain, Roscoe, Phillips, and Johnston appeared, ready to charge into Jackson's cell. The team began to slap each other on the back in apparent excitement over their opportunity to use force they were about to deploy against Jackson. *See* video link at FN1, above.

29.     When the tactical team arrived, Jackson questioned why the officers were shooting him with pepper spray since all he had done was insist on his right to receive a shower. *Id.*

30.     There was no need for the use of any force against Jackson because he did not pose any

threat to Defendants, other jail staff, other inmates, or to the security or operation of the jail. Nor could Defendants have reasonably perceived that any such threat existed, let alone a threat that would have required the deployment of toxic pepper gas. *Id.*

31.     Despite that there was no need to do so, Kelley ordered the team to charge into Jackson's cell, causing four tactical officers to forcefully tackle Jackson to the ground and pin him against the floor of his cell using a tactical shield. *Id.*

32.     While the tactical team charged into the cell and tackled Jackson, Kelley, Broeckel, and Jecubic stood back and watched. *Id.*

33.     Kelley, Broeckel, and Jecubic purposefully positioned themselves to ensure that there would be no video evidence of what actually occurred once the tactical team had charged into the cell and tackled Jackson to the ground. *Id.*

34.     Jackson, who has asthma, began to cry out that he could not breathe due to the eight rounds of pepper bombs that Kelley and Broeckel had already deployed into the cell, in addition to the fact that four armed tactical officers had just tackled Jackson to the ground and were actively pressing him into the pavement using the force of their collective body weight.

35.     Without any legitimate need or justification to do so—especially since the team had already secured Jackson on the ground—Phillips, who had control over Jackson's upper left extremities, unnecessarily deployed pepper foam to Jackson's face to exacerbate the level of pain Jackson was already experiencing. *Id.*

36.     In his report concerning the incident, Phillips sought to justify his excessive and unnecessary use of pepper facial foam against Jackson by writing, falsely, that Jackson continued to act in a combative manner after officers had secured him on the ground.

37.     Even though Jackson was motionless on the ground, Defendants began to falsely accuse Jackson of resisting in an attempt to justify their further use of unlawful force against him.

38.     After the extraction team strapped Jackson into a restraint chair and slowly rolled him to the elevator, Defendants congratulated each other for doing a "good job" in assaulting in response to a situation that Defendants had themselves created for the purpose of abusing Jackson.

39.     Once in the chair, Jackson immediately showed signs of physical distress and begged for help because he was in extreme pain from the eight rounds of pepper bombs that Kelley and Broeckel had excessively and unnecessarily deployed into Jackson's cell, the facial pepper foam that Phillips had gratuitously applied to Jackson's face, and the tactical team having tackled and pinned him against the cell floor.

40.     The amount of force used against Jackson was in no sense proportionate to any conceivable or claimed need to control Jackson or to maintain or restore discipline at the jail, but was excessive, unnecessary, and objectively unreasonable.

41.     Defendants knew that they could not decontaminate Jackson's eyes, otherwise rinse his face, or deliver him to a nurse until they had documented Jackson's name and identification number and gathered information about his health issues.

42.     Despite that knowledge, and despite that Defendants could have been gathering this information to expedite the decontamination process while they slowly transported Jackson to the decontamination room Defendants purposefully waited to obtain and document the necessary information about Jackson until after arriving at the decontamination room.

43.      Once Defendants finally began to gather the necessary information, they intentionally and purposefully made Jackson, who had repeatedly informed them that he was in excruciating pain, repeat his name and inmate identification number multiple times and instruct Defendants on how to spell Jackson's name and the word "asthma" before rinsing Jackson's eyes.

44.     On March 18, 2020, Jackson sought medical attention from Dr. Austen Knapp concerning the injuries he suffered in the February 8, 2020 attack, because he was experiencing worsening

symptoms in his left eye, including drainage, loss of vision, and continued pain and swelling.

45.     As a result of Defendants' excessive and unnecessary use of pepper bombs and pepper foam against Jackson, Dr. Knapp diagnosed Jackson with anterior uveitis.

46.     The symptoms of anterior uveitis include swelling, pain, and destruction of eye tissue, as well as reduced vision or severe vision loss that can be permanent in nature.

47.     In order to treat the serious eye damage and pain Jackson suffered as a result of Defendants' unnecessary and excessive use of force, Dr. Knapp placed Jackson on a daily regimen of eye drops, including prednisolone, cyclopentolate, and brimonidine, to manage the symptoms of his anterior uveitis, which have yet to subside.

### V. Causes of Action

### Count 1: Eighth Amendment violation under 42 U.S.C. § 1983 – Excessive force

48.     Jackson incorporates the foregoing paragraphs as if fully rewritten here and asserts this Count 2 against Defendants Kelley, Broeckel, Dwain, Roscoe, Phillips, and Johnston, in their personal and individual capacities.

49.     Defendants used an amount force against Jackson that was excessive, unnecessary, and objectively unreasonable, and did so maliciously and sadistically for the very purpose of causing Jackson harm.

50.     Defendants' use of force against Jackson, including deploying eight rounds of pepper balls and facial pepper foam against Jackson and tackling and pinning him to the ground, was not done in good faith, was not done to protect the safety of inmates or staff, and was not done to maintain or restore discipline at the jail. To the contrary, it was excessive, unnecessary, and objectively unreasonable.

51.     Defendants' acts were undertaken knowingly and intentionally, with malice, with a conscious disregard of Jackson's rights and interests, and with certainty of inflicting harm and damage on

Jackson.

52.     Jackson suffered severe pain and injury as a result of Defendants' excessive and unnecessary

use of force, including difficulty breathing, coughing, burning and swelling eyes. As a further result

of Defendants' unlawful acts, Jackson has developed anterior uveitis, which has caused him to suffer

continued vision loss, pain, and swelling, and may lead to permanent vision loss and eye damage.

53.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter these Defendants and others from engaging in this type of unlawful conduct.

54.     Cuyahoga County is also liable for Defendants' acts as alleged in this Count due to its failure

to train the Defendants on when and how pepper bombs and pepper foam are properly used, and is

further liable to Plaintiff to the extent Defendants claim their acts were taken pursuant to an

officially adopted or promulgated policy, or a pervasive or long-standing custom or practice, or

pursuant to a decision or act made by an official asserted to be a final policymaker for the County.

**Count 2: Eighth Amendment violation under 42 U.S.C. § 1983 – Failure to intervene**

55.     Jackson incorporates the foregoing paragraphs as if fully rewritten here and asserts this

Count 2 against Defendants Kelley, Jecubic, and Broeckel in their personal and official capacities.

56.     Kelley and Jecubic, both of whom are sergeants, and Broeckel, who is a corporal, held

supervisory positions over officers Dwain, Roscoe, Phillips, and Johnston, who comprised the

tactical team that tackled Jackson and gratuitously deployed pepper foam to Jackson's face.

57.     Even in the absence of having supervisory authority over the tactical officers, Kelly, Jecubic,

and Broeckel otherwise had a duty to prevent the use of unnecessary and excessive force against

Jackson, and to intervene and attempt to end the unlawful force used against Jackson.

58.     Kelley, Jecubic, and Broeckel personally observed the tactical team's attack on Jackson and

had the means and opportunity to intervene to prevent or otherwise stop the tactical team from

using excessive force against Jackson, including by not ordering the tactical team to charge after

Jackson in the first place when there was no need to do so.

59.     Kelley, Jecubic, and Broeckel knew or had reason to know that the tactical officers who they were responsible for supervising would use or were using an amount of force against Jackson that violated his Eighth Amendment right to be free from unnecessary and excessive force.

60.     Despite having the means and opportunity to intervene, Kelley, Jecubic, and Broeckel chose not to take reasonable measures to protect Jackson from further unnecessary and excessive force and instead, watched as the attack occurred and actively ensured that their body cameras would not capture video of the attack.

61.     By choosing not to intervene or otherwise act to protect Jackson, Kelley, Jecubic, and Broeckel functionally participated in the unlawful acts of their subordinate tactical officers.

62.     Defendants' acts were undertaken knowingly and intentionally, with malice, with a conscious disregard of Jackson's rights and interests, and with certainty of inflicting harm and damage on Jackson.

63.     Jackson suffered severe pain and injury as a result of Defendants' excessive and unnecessary use of force, including difficulty breathing, coughing, burning and swelling eyes. As a further result of Defendants' unlawful acts, Jackson has developed anterior uveitis, which has caused him to suffer continued vision loss, pain, and swelling, and may lead to permanent vision loss and eye damage.

64.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter these Defendants and others from engaging in this type of unlawful conduct.

65.     Cuyahoga County is also liable for Defendants' acts as alleged in this Count due to its failure to train the Defendants on when and how pepper bombs and pepper foam are properly used, and is further liable to Plaintiff to the extent Defendants claim their acts were taken pursuant to an officially adopted or promulgated policy, or a pervasive or long-standing custom or practice, or pursuant to a decision or act made by an official asserted to be a final policymaker for the County.

**Count 3: Assault**

66.     Jackson incorporates the foregoing paragraphs as if fully rewritten here and asserts this

Count 3 against all Defendants in their personal capacities only.

67.     Defendants, through the intentional and wrongful acts described herein, caused Jackson to

suffer and/or experience reasonable apprehension of immediate harmful or offensive contact at the

hands of Defendants.

68.     Defendants knew with substantial certainty that their actions would cause Jackson to suffer

and/or experience the reasonable fear of harmful or offensive contact.

69.     Defendants' acts were undertaken knowingly and intentionally, with malice, with a conscious

disregard of Jackson's rights and interests, and with certainty of inflicting harm and damage on

Jackson.

70.     As a direct and proximate result of Defendants' unlawful acts, Jackson has suffered and

continues to suffer economic and non-economic damages for which Defendants are liable, including

mental, emotional, and physical pain and suffering.

71.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter these Defendants and others from engaging in this type of unlawful conduct.

**Count 4: Battery**

72.     Jackson incorporates the foregoing paragraphs as if fully rewritten here and asserts this

73.     Defendants engaged in the actions described herein intending to cause, and did actually

cause, a harmful and offensive contact with Jackson.

74.     Defendants' harmful and offensive contact against Jackson was unlawful and unwanted.

75.     Defendants' acts were undertaken knowingly and intentionally, with malice, with a conscious

disregard of Jackson's rights and interests, and with certainty of inflicting harm and damage on

Jackson.

76.     As a direct and proximate result of Defendants' unlawful acts, Jackson has suffered and

continues to suffer economic and non-economic damages for which Defendants are liable, including

mental, emotional, and physical pain and suffering.

77.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter these Defendants and others from engaging in this type of unlawful conduct.

## VI. Prayer for relief

Wherefore, Plaintiff Marquise Jackson demands judgment against the Defendants, jointly

and severally, in an amount in excess of seventy-five thousand dollars ($75,000), together with

punitive and exemplary damages, attorneys' fees, costs, expenses and any other relief to which

Jackson may be entitled or that the Court deems equitable and just.

## VII. Jury Demand

Plaintiff demands a trial by jury on all issues within this Complaint.

Respectfully Submitted,

Peter Pattakos (0082884)
Rachel Hazelet (0097855)
THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn, Ohio 44333
Phone: 330.836.8533
Fax: 330.836.8536
peter@pattakoslaw.com
rhazelet@pattakoslaw.com

*Attorneys for Plaintiff Marquise Jackson*